UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GWENDOLYN ROBERSON,

       Plaintiff,

v.                                          Case No. 09-12083
                                          Honorable Patrick J. Duggan

MICHIGAN DEPARTMENT OF
STATE POLICE, MICHIGAN STATE
POLICE TROOPER DARRIN GRANDISON,
MICHIGAN STATE POLICE TROOPER
CLARENCE VINCENT, and MICHIGAN
STATE POLICE TROOPER COPPENS, in
their official and individual capacities,

       Defendants.

_____/

GWENDOLYN ROBERSON,

       Plaintiff,

v.

                                          Case No. 09-14101

MGM GRAND DETROIT, LLC, MGM       Honorable Patrick J. Duggan
GRAND DETROIT CASINO, LCC, MGM
GRAND DETROIT CASINO II, LLC,
MICHIGAN DEPARTMENT OF
STATE POLICE, MICHIGAN STATE
POLICE TROOPER DARRIN GRANDISON,
MICHIGAN STATE POLICE TROOPER
CLARENCE VINCENT, and MICHIGAN
STATE POLICE TROOPER COPPENS,

       Defendants.

_____/

**OPINION AND ORDER (1) GRANTING DEFENDANT MGM GRAND DETROIT, LLC'S MOTION FOR SUMMARY JUDGMENT AND (2) GRANTING IN PART AND DENYING IN PART THE MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT FILED BY DEFENDANTS MICHIGAN STATE POLICE AND TROOPERS GRANDISON, VINCENT, AND COPPENS**

Following a May 29, 2007 incident at the MGM Grand Casino in Detroit, Michigan, Plaintiff Gwendolyn Roberson ("Plaintiff") filed two lawsuits. Plaintiff filed the first lawsuit, Civil Case No. 09-12083 (also "Complaint I"), in this Court against the Michigan Department of State Police ("MSP") and Michigan State Troopers Darrin Grandison ("Detective Grandison"), Clarence Vincent ("Detective Vincent"), and Robin Coppens ("Sargent Coppens") (collectively "MSP Defendants"). Plaintiff filed the second lawsuit in the Circuit Court for Wayne County, Michigan on July 9, 2009, against the MSP Defendants and MGM Grand Detroit, LLC, MGM Grand Detroit Casino, LLC, and MGM Grand Detroit Casino II, LLC (collectively "MGM").[1] The MSP Defendants removed Plaintiff's second lawsuit to this Court on October 16, 2009, where it was assigned Civil Case No. 09-14101 (also "Complaint II"). The lawsuits were consolidated on January 5, 2010, and were assigned to the undersigned on November 24, 2010.[2]

---

[1]The owner/operator of the MGM Grand Casino in Detroit is MGM Grand Detroit, LLC. According to MGM Grand Detroit, LLC, the other entities named by Plaintiff do not exist. (Doc. 21 at 1 n.2.)

[2]Complaint I initially was assigned to the Honorable John Feikens. Complaint II, upon removal, was assigned to the Honorable Lawrence P. Zatkoff, but it was reassigned to Judge Feikens as a companion matter on November 5, 2009. Both lawsuits were then reassigned to the undersigned pursuant to Administrative Order 10-AO-033 on November 24, 2010.

2

At that time, MGM's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) and the MSP Defendants' motion to dismiss pursuant to Rule 12(b)(6) and/or for summary judgment pursuant to Rule 56(c) were pending.  This Court held a hearing with respect to the motions on February 3, 2011.

## I.  Applicable Standards

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint.  *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).  Reviewing a motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and "determine whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Bledsoe v. Community Health Sys.*, 501 F.3d 493, 502 (6th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 127 S. Ct 1955, 1974 (2007)).

Summary judgment pursuant to Federal Rule of Civil Procedure 56(c) is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a

party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S. Ct. at 2513.

## II.    Factual and Procedural Background

On May 29, 2007, at approximately 9:40 p.m., Plaintiff and her husband, Horace Roberson ("Mr. Roberson"), entered the MGM Grand Casino ("casino"). After they entered the casino, Plaintiff proceeded toward the cage cashier to cash a check so she would have some money for gaming purposes. Mr. Roberson walked toward a gaming table.

When she arrived at the window of MGM Casino Cage Cashier Angela Chipp ("Cashier Chipp"), Plaintiff presented a personal check in the amount of $200 for

4

cashing.  The check was a temporary check provided to Plaintiff by her credit union, CO-OP Services Credit Union.  Cashier Chipp obtained Plaintiff's Michigan Driver's License and had Plaintiff mark her thumb print on the check.  Upon her examination of the check, Cashier Chipp immediately noticed that the check was misprinted.  Specifically, the bank logo was crooked in relation to the memo line and the check was printed off-center.  (Doc. 21 Ex. 5 at 27; Ex. 4.)  Cashier Chipp therefore did not run the check through MGM's check verification service, Certegy.  She testified that pursuant to Certegy's rules and MGM's standard protocol, a cashier noticing physical oddities with a check must present the check to a supervisor.  (Doc. 21 Ex. 5 at 14-19; Ex. 13 at 23-24.)  Cashier Chipp brought Plaintiff's check to her supervisor, Ebony Robinson ("Supervisor Robinson").

Supervisor Robinson also found the check suspicious and therefore, also pursuant to MGM policy, notified MGM Security Supervisor Michael Mitchell ("Security Supervisor Mitchell").  Security Supervisor Mitchell reviewed Plaintiff's check and found it suspicious based on the fact that it was printed "crooked."  (Doc. 21 Ex. 6 at 54.)  Pursuant to Michigan gaming statutes and regulations, MGM has a duty to report all potential crimes against the casino to MSP.  (*Id.* Ex. 21 at 61-63; *see also* Mich. Comp. Laws § 432.209(10).)  MGM therefore contacted MSP regarding Plaintiff's check.

After notifying MSP, Security Supervisor Mitchell approached Plaintiff.  At the time, he was wearing an MGM security guard uniform which consisted of a white shirt and dark pants and he had handcuffs inside a case attached to the back of his belt.  MGM

5

security guards carry handcuffs, however, they are not authorized to make arrests and are not "PA-330 certified".  (Doc. 21 Ex. 6 at 29; Ex. 7 at 85; *see* Mich. Comp. Laws § 338.1079 (Public Act 330).)  Plaintiff testified during her deposition that when Security Supervisor Mitchell approached her, he told her that she needed to step out of line and that there seemed to be something wrong with her check that required the casino to notify MSP.  (Doc. 21 Ex. 3 at 55.)  According to Security Supervisor Mitchell and MGM's Incident Reports concerning the event, Security Supervisor Mitchell informed Plaintiff that MSP would like to speak with her, that her check looked questionable, and that she nevertheless was free to leave.  (*Id*. Ex. 6 at 25; Ex. 12.)

Plaintiff then told Security Supervisor Mitchell that she needed to find her husband and tell him what was happening.  (*Id*. Ex. 3 at 58; Ex. 6 at 25.)  Plaintiff testified during her deposition that when she walked away, she looked over her shoulder and saw two security guards who she believes were following her.  (*Id.* Ex. 3 at 63-64.)  Plaintiff then located her husband and the two of them returned to where Security Supervisor Mitchell was waiting.

By that time, approximately four other MGM security guards were congregating in the area near Security Supervisor Mitchell, Plaintiff, and Mr. Roberson.  None of them said anything to Plaintiff or Mr. Roberson.  (*Id*. at 60.)  Security Supervisor Mitchell testified during his deposition and Plaintiff stated later on the videotape of the incident that these additional security guards were in the area at that time because it was near the security podium and there was a shift change.  (*Id*. Ex. 6 at 71; Doc. 34 Ex. 1.)  Within a

few minutes, Security Supervisor Mitchell instructed the other guards to leave.  (*Id*.)

Mr. Roberson asked Security Supervisor Mitchell what the problem seemed to be. Security Supervisor Mitchell explained that there was a problem with how Plaintiff's check looked; that "the numbers weren't lined up right or something to that effect."  (*Id*. Ex. 3 at 59.)  He further explained that the casino was required to notify MSP when it received a suspicious check.  Plaintiff testified during her deposition that Security Supervisor Mitchell told Mr. Roberson that "this is a fraudulent check, we have our procedures to follow."  (*Id*. at 67.)  Mr. Roberson testified during his deposition that Security Supervisor Mitchell told him that "it looks like we have a fraudulent or bad check here" and that he showed Mr. Roberson how the check was printed crooked, that it was not lined up properly.  (Doc. 24 Ex. 12 at 14-15.)

At that point, Plaintiff or one of the cage cashiers asked if the group could move to another location, as it was getting crowded in front of the cage.  (*Id*. at 16; Doc. 21 Ex. 3 at 70-71.)  As Plaintiff, Mr. Roberson, and Security Supervisor Mitchell walked away from the cage area, they were approached by Detective Grandison.  Detective Grandison was in plain clothes, wearing a Lions jersey.  Detective Grandison took over the investigation at that point and escorted Plaintiff onto an elevator to the casino's interview room.  Mr. Roberson was not permitted to join her.  Three MGM security guards were in the elevator with Plaintiff and Detective Grandison, as well as an unknown female patron

and MSP Trooper Emerson Cox.[3]  (Doc. 25 Ex. 10 at 27-28.)

When they reached the interview room, Plaintiff was directed to a seat on one side of a desk and Trooper Cox took the seat across from her.  (Doc. 34 Ex. 1.)  Detective Grandison entered another interview room with the unknown female.  A female MGM security guard remained in the interview room with Plaintiff and Trooper Cox while Trooper Cox spoke with Plaintiff.  During this time, Plaintiff was searching through her purse for information related to her credit union checking account.  (*Id.*)  Trooper Cox remained in the room with Plaintiff for three minutes and then left.  (Doc. 25 Ex. 2.)  A minute later, Detective Grandison entered the room.  (*Id.*)

In his report regarding the incident, Detective Grandison described what transpired next as follows:

> I entered the security interview room and noticed Roberson seated at the table.  I also noticed Roberson had a purse and two other bag type items on the table.  Roberson was gathering the three items together and started to slid [sic] them on the table, close to her body.
>
> **I did not know if the bags were searched or not, for safety and security reasons I wanted to separate them from the suspect.**
>
> I then grabbed two of the bags and began to push them back to the center of the table, while telling Roberson, the items had to stay in the center on the table.

---

[3]Apparently the unknown female was at the cage around the same time as Plaintiff and was being questioned about a check she was attempting to cash.  Reviewing the videotape from the incident during his deposition, Detective Grandison testified that he was carrying the unknown female patron's documents when the group rode the elevator to the interview room.  (Doc. 25 Ex. 10 at 28.)

8

> Roberson quickly pulled the items back, along with my hand and began to clutch them to her chest.  I told Roberson a second time, that the items had to be in the center of the table and she refused to surrender the bags.  I made one attempt to retrieve the bags from her and she refused to surrender them again.
>
> At this point, I could feel Roberson getting combative and I told her to stand up and go into the holding cell.  Roberson refused and held on to the chair and a group of lockers, next to the floor.  I pulled on her arm, in order to get her to comply and she still refused [to] move.
>
> I then warned Roberson that I would use force to make her enter the holding cell if she did not go on her own power, on two occasions.  Roberson still held onto the chair and [a] panel of lockers.

(Doc. 25 Ex. 3 (emphasis in original, capitalization removed).)  What the video of the incident reveals is somewhat different.

Before Detective Grandison entered the interview room, Plaintiff was rummaging through her purse, removing some items, and putting some items back inside.  (Doc. 34 Ex. 1.)  She continued to do this when Detective Grandison entered the room.  At first, Detective Grandison stood on the opposite side of the desk from Plaintiff, talking to her, while she continued to rearrange the items from her purse.  (*Id.*)  A few seconds later, Detective Grandison turned his back on Plaintiff and took one or two steps away from the desk where she sat.  (*Id.*)

At this exact point, Plaintiff tells Detective Grandison that she is "very upset with this situation . . . that this is just totally unacceptable."  (*Id.*)  In response, Detective Grandison returns to the desk, telling Plaintiff: "Well look, it don't matter how you feel.  It's not our fault that you're here.  It's your check that's bad."  (*Id.*)  Detective Grandison

9

then walks around the desk to where Plaintiff is sitting while stating, "I have no idea why you're here and I don't care, but you don't get upset with us." (*Id.*) Plaintiff responds: "I'm upset period and you're supposed to know how to deal with that." (*Id.*) Detective Grandison then begins to reach for Plaintiff's purse, which is still in Plaintiffs hands but sitting on the desk. (*Id.*) Detective Grandison instructs Plaintiff to set her "things down here"; Plaintiff tells him not to take her stuff and slides her belongings away from Detective Grandison. (*Id.*) At that point, Detective Grandison tells Plaintiff to "get up and go in here," pointing at a holding cell adjoining the interview room. (*Id.*) He states again, "get up before I get you up" and grabs Plaintiff's arm. (*Id.*)

Plaintiff, still sitting in the chair, tells Detective Grandison not to touch her. (*Id.*) Standing over her, he instructs her again to go into the holding cell. (*Id.*) Plaintiff asks Detective Grandison why she needs to go into the holding cell and he replies, "cuz, I'm tired of talking to you." (*Id.*) At that point, Detective Grandison grabbed an exposed portion of the front seat and the backrest of the chair and dragged it, along with Plaintiff, into the holding cell. (*Id.*) As he is doing so, the chair tipped over inside the holding cell, with Plaintiff still in it. (*Id.*) Detective Grandison exits the holding cell and closes the door. (*Id.*)

Detective Grandison then proceeds to empty the contents of Plaintiff's purse onto the desk, including removing the items from what appears to be wallets and flipping through the pages of what looks like a date or address book. (*Id.*) At this point, additional people (an MGM security guard, two men whose associations are not

10

identified, and Sargent Coppens) enter the interview room.  (Doc. 34 Ex. 1.)  When asked

during his deposition in this case what evidence he had at this point to believe Plaintiff

committed check fraud, Detective Grandison answered: "I just walked into the room and

as of right now I believe I'm just now taking over the case, so I have not looked at

anything yet."  (Doc. 25 Ex. 10 at 40.)  He told the other individuals who had entered the

interview room after he placed Plaintiff in the holding cell that he had not spoken with the

cage cashier yet.  (Doc. 34 Ex. 1.)

About three minutes after putting Plaintiff in the holding cell, Detective Grandison

notices that she has her cell phone with her.  (*Id*.)  Detective Grandison enters the holding

cell and attempts to take the phone from Plaintiff; at which point, Plaintiff placed the cell

down her pants.  (*Id*.)  Plaintiff tells Detective Grandison to have a woman come in and

she will give her the cell phone.  (*Id*.)  Sargent Coppens is summoned to the holding cell,

at which time Plaintiff gives Sargent Coppens the phone.  (*Id*.)

Over the next two hours, Detective Grandison, Sargent Coppens, and Trooper

Vincent investigated the matter.  Detective Grandison contacted Certegy and was

informed that two other checks drawn on Plaintiff's credit union account had been cashed

at the casino recently.  (Doc. 25 Ex. 3; Doc. 24 Ex. 17 at 20.)  Certegy indicated that both

checks initially were denied but were accepted after the cashier continued to process the

checks over and over again.  (*Id*.)

11

In light of the uneven printing of Plaintiff's checks[4] and the circumstances surrounding the cashing of her prior checks, Detective Grandison decided shortly after midnight, now May 30, 2007, to book Plaintiff pending further investigation.  At approximately 12:15 a.m., Plaintiff was escorted out of the holding cell, handcuffed by Sargent Coppens, and transported by Sargent Coppens to an MSP office for processing. Before leaving the interview room, however, an MGM security guard approached Plaintiff and "permanently trespassed" her.[5]  (Doc. 25 Ex. 2.)  This means that Plaintiff was informed that she could no longer enter any MGM/Mirage properties.

At the MSP office, Plaintiff was booked on two felony charges: (1) "2693 Uttering and Publishing" in violation of Michigan Compiled Laws § 750.249; and (2) "5099 Obstruction of Justice" in violation of Michigan Compiled Laws § 750.505.  (Doc. 25 Ex. 3.)  Plaintiff was released sometime after 1:00 a.m.

In the days that followed, Detective Grandison contacted Plaintiff's credit union and learned that Plaintiff's checks were drawn on a valid account.  Accordingly, the MSP closed its investigation and did not pursue any charges against Plaintiff.

---

[4]Additional starter checks were located in Plaintiff's purse that also were not printed straight.

[5]"Trespassing" a patron is a process whereby the casino places the patron on its "disassociated persons list."  Photographs are taken of the patron and he or she is read the trespassing statute, Michigan Compiled Laws § 432.225, and warned not to enter the casino premises again.  If such a person attempts to enter the casino, it is considered a misdemeanor criminal trespass punishable by one year in prison and/or a $1,000 fine. Mich. Comp. Laws § 432.225(13).

As indicated earlier, Plaintiff thereafter filed two separate lawsuits arising from the May 29, 2007 incident.  In Complaint I, Plaintiff names the MSP Defendants, only.  She names the MSP Defendants and the MGM Defendants in Complaint II.  Plaintiff asserts the following claims in both complaints:

•Unlawful confinement, unlawful search, conspiracy, and "refusing or neglecting [to] prevent" (i.e. failure to train or supervise) in violation of 42 U.S.C. § 1983, filed <u>against the MSP Defendants</u> (in Counts 1-5 of Complaint I and Count 4 of Complaint II);

•False imprisonment, filed <u>against the MSP Defendants</u> (in Count 6 of Complaint I and Count 5 of Complaint II) <u>and against MGM</u> (in Count 1 of Complaint II);

•Assault and Battery, filed <u>against the MSP Defendants</u> (in Count 7 of Complaint I and Count 6 of Complaint II);

•Defamation/Slander, filed <u>against the MSP Defendants</u> (in Count 8 of Complaint I and Count 7 of Complaint II) <u>and against MGM</u> (in Count 2 of Complaint II);

•Violations of the Elliot-Larsen Civil Rights Act, filed <u>against the MSP Defendants</u> (in Count 9 of Complaint I and Count 8 of Complaint II) <u>and against MGM</u> (in Count 3 of Complaint II); and

•Intentional/Negligent Infliction of Emotional Distress, filed <u>against the MSP Defendants</u> (in Count 10 of Complaint I) <u>and against MGM</u> (in Count 9 of Complaint II).

## III.    Applicable Law and Analysis

### A.    Defamation against MGM and the MSP Defendants

A plaintiff alleging defamation must establish the following elements: "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and

13

(4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication [(defamation per quod)]." *Oesterle v. Wallace*, 272 Mich. App. 260, 263-64, 275 N.W.2d 470 (2006).  MGM seeks summary judgment with respect to Plaintiff's defamation claim arguing (1) there was no false statement made by MGM; (2) there was no unprivileged communication to a third party because any statement was made, at most, to Mr. Roberson and MSP; (3) there was no malice or fault on the part of MGM; and (4) there is no defamation per se or special harm. The MSP Defendants seek summary judgment with respect to Plaintiff's defamation claims, contending that they are entitled to qualified immunity pursuant to Michigan Compiled Law Section § 691.1407.

Even when viewing the evidence in a light most favorable to Plaintiff, this Court finds no evidence that MGM or MSP communicated a false statement regarding Plaintiff to anyone other than MGM staff, MSP personnel, and Mr. Roberson.  According to Plaintiff, Security Supervisor Mitchell was the only defendant who communicated with her and/or Mr. Roberson regarding the check while on the casino floor (i.e. in public). (Doc. 21 Ex. 3 at 70.)  Security Supervisor Mitchell indicated that "there *seems to be* something wrong with [Plaintiff's] check" or there "*seemed to be* a problem." (*Id*. at 55.) When asked by Mr. Roberson, Security Supervisor Mitchell explained that "*there seemed to be* a problem with how the checks looked; they didn't look right." (*Id*. at 59.)  Mr. Roberson testified that Security Supervisor Mitchell stated "that *it looks like* we have a fraudulent or bad check here" and "*it looks like* there's a bad check."  (Doc. 24 Ex. 12 at

14

14-15.)

Plaintiff later testified in her deposition that Security Supervisor Mitchell told Plaintiff and Mr. Roberson "look, this is a fraudulent check." (*Id.* at 67.) However, as Plaintiff's counsel conceded at the motion hearing, there is no evidence that anyone other than MGM staff heard this alleged statement and the videotape of Security Supervisor Mitchell's encounter with Plaintiff and her husband (specifically where they were standing in relation to other patrons and patrons' reactions as they walked near them), suggests this as well. Plaintiff also points to statements in MGM's Incident Reports; however, there is no evidence that these statements were communicated to a third party. At the motion hearing, Plaintiff's counsel indicated that one of the MSP Defendants contacted Plaintiff's employer and told the employer that Plaintiff would be late for work that evening because she was being investigated for check fraud. There is nothing false about this statement, however, to support the first element of Plaintiff's claims.

Any statements made by MGM to the MSP or vice versa are privileged, as MGM has a statutory duty to notify the MSP of any suspected or potential criminal activity in its casino. *See* Mich. Comp. Law § 432.209(10); *see also Hall v. Pizza Hut of Am., Inc.*, 153 Mich. App. 609, 619, 396 N.W.2d 809, 813 (1986) ("information given to police officers regarding criminal activity is absolutely privileged.") There is no evidence of malice or a lack of good faith on the part of Security Supervisor Mitchell or anyone else sufficient to overcome this privilege.

Based on the above discussion, the Court concludes that MGM and the MSP

15

Defendants are entitled to summary judgment with respect to Plaintiff's

defamation/slander claims.  The Court therefore finds it unnecessary to address

defendants' other arguments in support of dismissal of these claims.

### B.    Elliot-Larsen Civil Rights Act ("ELCRA") against MGM and the MSP Defendants

Plaintiff alleges that MGM and the MSP Defendants discriminated against her

based on her race in violation of the ELCRA.  Specifically Plaintiff, an African-

American, alleges that she received service from defendants in a "markedly hostile

manner" that a reasonable person would find objectively discriminatory.  (*See* Doc. 24 at

19.) To prevail on her ELCRA claims, Plaintiff must establish the following: "(1)

discrimination based on a protected characteristic (2) by a person (3) resulting in the

denial of the full and equal enjoyment of the goods, services, facilities, privileges,

advantages, or accommodations (4) of a place of public accommodation."  *Hayes v.

Neshewat*, 477 Mich. 29, 35, 729 N.W.2d 488, 492 (2007).  To establish the first element,

Plaintiff "may prove either intentional discrimination or disparate treatment by

Defendant[s]."  *Sanders v. Southwest Airlines, Co.*, 86 F. Supp. 2d 739, 744 (E.D. Mich.

2000) (citing *Reisman v. Regents of Wayne State Univ.*, 188 Mich. App. 526, 538, 470

N.W.2d 678, 685 (1991)).  Plaintiff in the present case attempts to demonstrate

discrimination through the second method.

"Disparate treatment may be proved by showing that the plaintiff is a member of a

protected class and was treated differently than persons of a different class for the same or

16

similar conduct." *Sanders*, 86 F. Supp. 2d at 744 (citing *Reisman*, 188 Mich. App. at 538,

470 N.W.2d at 685). With respect to MGM, Plaintiff attempts to make this showing by

referring to the sample of Incident Reports involving check fraud investigations that the

casino produced during discovery. First, Plaintiff has not presented these incident reports

as evidence. She asserts in her response brief, however, that of the 70 check fraud

investigations for which reports were produced, 88% involved black suspects and only

7% involved white suspects. (Doc. 24 at 19.) This purported evidence proves nothing,

however.

Plaintiff has not presented evidence to enable this Court to determine whether the

70 reports provided to her are representative of the check fraud investigations that MGM

has conducted or whether suspicious checks are presented to the casino proportionally by

Caucasian and African-American patrons to make the statistics suggestive of

discriminatory treatment. According to Security Supervisor Mitchell, of the check fraud

investigations in which he has been involved, the majority involve Caucasian patrons.

(Doc. 21 Ex. 6 at 39-40.)

To support her race discrimination claim against the MSP Defendants, Plaintiff

relies on a single incident report involving Detective Grandison. This report summarizes

Detective Grandison's investigation of a $1,000 check presented by a male, Caucasian

patron at the Motor City Casino in Detroit. (Doc. 25 Ex. 16.) The check had been

rejected by the "computer system" and the casino contacted MSP to investigate. (*Id.*)

Detective Grandison contacted Certegy and, after determining that the account number

17

and routing number were valid and valid to the presenter, advised the patron that he was free to go.  (*Id.*)  This evidence summarizing only one other investigation involving Detective Grandison is insufficient to lead a reasonable trier of fact to conclude that Plaintiff's race was the basis for the manner in which she was treated by the MSP Defendants.

For these reasons, the Court finds that Plaintiff fails to present evidence to create a genuine issued of material fact with respect to her race discrimination claims under the ELCRA.  Accordingly, Defendants are entitled to summary judgment with respect to these claims.

### C.    42 U.S.C. § 1983 Claims Against the MSP Defendants[6]

Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that the MSP Defendants

unlawfully arrested, detained, and confined her, unlawfully searched her belongings,

engaged in a conspiracy to violate her civil rights, and that the MSP and Sargent Coppens

failed to supervise, train, or control the remaining MSP Defendants.  To state a § 1983

claim, a plaintiff must establish: "'(1) the deprivation of a right secured by the

Constitution or the laws of the United States (2) caused by a person acting under the color

of state law.'"  *Miller v. Sanilac County*, 606 F.3d 240, 247 (6th Cir. 2010) (quoting

*Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

As an initial matter, the MSP and the individual troopers to the extent that they are

sued in their official capacities are not "persons" for purposes of § 1983.  *See, e.g., Will v.

Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989).  They also are

---

[6]Plaintiff has not asserted any § 1983 claims against MGM, although she relies on case law addressing § 1983 false arrest claims in response to MGM's motion to dismiss her state-law false imprisonment claim.  (*See* Doc. 24 at 16-17.).  To the extent Plaintiff intended to assert § 1983 claims against MGM, those claims would fail.  In determining whether private security guards are private actors whose conduct in detaining the plaintiffs is "fairly attributable to the state" for purposes of § 1983, the Sixth Circuit has focused on whether the security guards are licensed pursuant to Michigan Compiled Law § 339.1079.  *Compare Lindsey v. Detroit Ent't LLC*, 484 F.3d 824, 829-30 (6th Cir. 2007) (holding that where none of the casino's security guards were authorized to make arrests under Michigan law means that their conduct was not "fairly attributable to the state" and they are not state actors); *with Romanski v. Detroit Ent't LLC*, 428 F.3d 629, 637 (6th Cir. 2005) (finding that casino security guards licensed under Michigan Compiled Laws § 339.1079 are *de facto* police officers and may qualify as state actors for purposes of § 1983.  As set forth in the factual background section, MGM's security guards are not § 339.1079 certified and are not authorized to make arrests.

entitled to Eleventh Amendment Immunity.  *See Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 (6th Cir. 2004).

Plaintiff relies on the Supreme Court's decision in *Lapides v. Board of Regents*, 535 U.S. 613, 122 S. Ct. 1640 (2002), to argue that the MSP Defendants waived their immunity under the Eleventh Amendment when they removed Plaintiff's complaint to federal court.  First, Plaintiff overlooks the fact that she filed her first complaint *in this Court* against the MSP Defendant alleging § 1983 violations.  Second, the Supreme Court's holding in *Lapides* is far narrower than Plaintiff reads it.  *Lapides* is expressly limited to the issue of whether a state that removes *state-law claims* to federal court *having already consented to suit in its own courts* can remove the case to federal court and invoke Eleventh Amendment Immunity.  535 U.S. at 617-18, 122 S. Ct. at 1643 (indicating that "we must limit our answer to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings" and "[n]or need we address the scope of waiver by removal in a situation where the State's underlying sovereign immunity from suit has not been waived or abrogated in state court").

To the extent Plaintiff is suing the MSP officers in their individual capacities, the MSP Defendants argue that they are entitled to qualified immunity.  "Under the doctrine of qualified immunity, 'government officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Phillips v. Roane County*, 534

20

F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.

Ct. 2727, 2738 (1982)).  The determination of whether government officials are entitled

to qualified immunity requires two inquiries: "First, viewing the facts in the light most

favorable to the plaintiff, has the plaintiff shown that a constitutional violation has

occurred? Second, was the right clearly established at the time of the violation?"  *Id.* at

538-39.

　　　The MSP Defendants argue that they did not violate Plaintiff's Fourth Amendment

rights because their conduct constituted a lawful *Terry* stop.  *See Terry v. Ohio*, 392 U.S.

1, 88 S. Ct. 1868 (1968).  A *Terry* stop is a "brief investigatory stop[ ] of persons," *United*

*States v. Cambell*, 549 F.3d 364, 370 (6th Cir. 2008) (internal quotation omitted), that is

justified under the Fourth Amendment when an officer has reasonable suspicion "to

conclude in light of his experience that criminal activity may be afoot." *Terry*, 392 U.S. at

30, 88 S. Ct. at 1884.  The Sixth Circuit has provided the following guidance in

evaluating the validity of a *Terry* stop:

> We engage in a two-part analysis when evaluating the constitutionality of a
> Terry stop. First, we determine "whether there was a proper basis for the
> stop, which is judged by examining whether the law enforcement officials
> were aware of specific and articulable facts which gave rise to reasonable
> suspicion." [*United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)]
> (quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir.1993)). We
> examine the totality of the circumstances in order "to determine the
> reasonableness of the investigatory stop." *Id.* (citing *United States v. Bailey*,
> 302 F.3d 652, 658 (6th Cir.2002)). . . .
>
> Second, we examine "whether the degree of intrusion . . . was reasonably
> related in scope to the situation at hand, which is judged by examining the
> reasonableness of the officials' conduct given their suspicions and the

21

surrounding circumstances." *Davis*, 430 F.3d at 354 (quoting *Garza*, 10
F.3d at 1245). Thus, we must determine (1) if the detention was
"sufficiently limited in time" and (2) if "the investigative means used the
least intrusive means reasonably available." *Id*. (quoting *Bennett v. City of
Eastpointe*, 410 F.3d 810, 825-26 (6th Cir.2005)).

*United States v. Davis*, 514 F.3d 596, 608 (6th Cir. 2008). During a *Terry* stop, an officer

may perform "a reasonable search for weapons for the protection of the police officer."

*Id*. at 27, 88 S. Ct. at 1883. This search must be based on the officer's "belie[f] that he is

dealing with an armed and dangerous individual." *Id.* In order to arrest a suspect, an

officer must have probable cause. *See, e.g., Lyons v. City of Xenia*, 417 F.3d 565, 573

(6th Cir. 2005).

Applying the above criteria, the Court finds a genuine issue of material fact only

with respect to whether Detective Grandison engaged in an unlawful seizure of Plaintiff

or search of her belongings and with respect to whether Sargent Coppens engaged in an

unlawful arrest of Plaintiff. Plaintiff has not created a genuine issue of material fact with

respect to whether Detective Vincent violated her Fourth Amendment rights.

It is clear from the videotape of the incident and the remaining evidence presented

by the parties, including Plaintiff's testimony, that there was a proper *Terry* stop of

Plaintiff at least up to the point when Detective Grandison grabbed the chair on which

Plaintiff sat and dragged it, along with Plaintiff, into the holding cell. There is no dispute

that the check Plaintiff presented to Cashier Chipp was misprinted and therefore

suspicious. Additionally, it was a starter check and the casino, as a practice, does not

cash them very often. (Doc. 21 Ex. 6 at 67.) Pursuant to MGM policy, a casino cashier is

*required* to notify a supervisor when presented with a suspicious check and a supervisor agreeing with the assessment is required to notify casino security. Pursuant to MGM policy *and Michigan law*, a casino is required to notify MSP when a patron is *potentially* committing check fraud or some other crime. Mich. Comp. Laws § 432.209. Thus there was a proper basis to investigate Plaintiff's check and the time it took for MGM to follow its and the State's procedures was not unreasonable.

Before the MSP troopers arrived, Plaintiff expressed her desire to move off the casino floor and, as Security Supervisor Mitchell escorted her to a more private area, the troopers arrived and took Plaintiff to the casino's interview room. Trooper Cox then began interviewing Plaintiff to gather information concerning check. Up until that point, any detention of Plaintiff was sufficiently limited in time and utilized the least intrusive means reasonably available under the circumstances.

However, when Detective Grandison grabbed Plaintiff's chair and dragged it, and Plaintiff, into the holding cell, Plaintiff's detention went beyond a *Terry* stop and had to be supported by probable cause. Nevertheless, there is no dispute that when this occurred, there were no other MSP officers in the interview room with Detective Grandison. There also were no other MSP officers in the interview room when Detective Grandison began searching Plaintiff's belongings and there is no indication that the other MSP Defendants participated in the search once they entered the room. Further, Plaintiff presents no evidence to support her failure to supervise or train claim against Sargent Coppens with respect to Detective Grandison's conduct up to this point. Sargent

23

Coppens, however, subsequently handcuffed Plaintiff and transported her to the MSP office, thereby participating in what Plaintiff alleges was an unlawful arrest.

To demonstrate that Detective Grandison or Sargent Coppens wrongfully arrested Plaintiff, she must prove that the officers lacked probable cause. *Miller*, 606 F.3d at 250. "'Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed.'" *Id*. (quoting *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009)). By his own admission, Detective Grandison did not have any information as to why Plaintiff was suspected of check fraud when he entered the interview room, subsequently moved Plaintiff into the holding cell, and searched her belongings.

Detective Grandison contends that he searched Plaintiff's belongings because he was concerned that she might have had a weapon. The videotape of the incident undermines his claim as it clearly shows Plaintiff rummaging through her bags for some time after Detective Grandison entered the interview room and before he attempted to take them from her. In fact, at one point while Plaintiff's hands were inside her purse, Detective Grandison turns his back to her. Detective Grandison did not turn around in response to Plaintiff pulling the bags towards herself or putting her hands inside the bags (she was doing both before he turned away); rather, Detective Grandison turned back towards Plaintiff in response to her complaint regarding the way she was being treated.

At the motion hearing, Plaintiff's counsel asserted that Detective Grandison seized Plaintiff because she refused to comply with his request to put her bags in the middle of

24

the table.  To the extent this was Detective Grandison's reason for seizing Plaintiff, he did not make that clear during his deposition in this case and it is not asserted in the MSP Defendants' motion for summary judgment.  Nevertheless, based on the facts discussed above, the Court finds a jury question as to whether Plaintiff resisted a lawful police order.

With respect to Sargent Coppens, by the time she handcuffed Plaintiff and transported her to the MSP office, the officers had obtained information that a reasonable jury could find negated probable cause for her arrest.  First, by this time, Detective Grandison had contacted Certegy and been informed that Plaintiff cashed two checks at the casino in the previous two weeks on the same credit union account.  The officers also were informed that Certegy had not rejected the check Plaintiff presented on May 27, 2009 (i.e. the night she was arrested); rather the cage cashier questioned the check simply because it was printed crooked.  Sargent Coppens in fact stated before handcuffing and transporting Plaintiff for booking: "All we have is a crappily printed check."  (Doc. 25 Ex. 12 at 238-40.)

For these reasons, the Court cannot find that Detective Grandison is entitled to qualified immunity with respect to Plaintiff's § 1983 unlawful arrest or search claims or that Sargent Coppens is entitled to qualified immunity with respect to Plaintiff's § 1983 false arrest claim. The Court believes that it is a jury question whether Plaintiff's conduct towards Detective Grandison justified his decision to place her in the holding cell and search her belongings and whether the officers had probable cause to subsequently

25

handcuff Plaintiff, transport her to the MSP office, and charge her with check fraud and obstructing a police officer.  For the reasons discussed earlier, however, Detective Grandison and Sargent Coppens are entitled to summary judgment with respect to these claims to the extent they are sued in their official capacities.  Plaintiff has not created a genuine issue of material fact with respect to whether Detective Vincent violated her Fourth Amendment rights and MSP is entitled to Eleventh Amendment immunity.  Therefore Detective Vincent and MSP are entitled to summary judgment with respect to Plaintiff's § 1983 claims.

### D.    False Imprisonment Against MGM and the MSP Defendants

Under Michigan law, false imprisonment is the unlawful restraining of a person's liberty or freedom of movement.  *Stowers v. Wolodzko*, 386 Mich. 119, 134, 191 N.W.2d 355, 363 (1971) (quotation marks and citation omitted).  "The essence of a claim of false imprisonment is that the imprisonment is false, [i].e., without right or authority to do so." *Hess v. Wolverine Lake*, 32 Mich. App. 601, 604, 189 N.W.2d 42, 44 (1971).  "In order to prevail on a claim of false arrest or false imprisonment, the plaintiff must show that the arrest was not legal, i.e. that it was made without probable cause." *Tope v. Howe*, 179 Mich. App. 91, 105, 445 N.W.2d 452, 459 (1989) (citation omitted).

For the reasons discussed in the preceding section, Plaintiff presents no evidence to support her false imprisonment claims against Detective Vincent or MGM and thus summary judgment is granted to those defendants on those claims.  In comparison, the Court finds evidence to create a genuine issue of fact with respect to whether Detective

26

Grandison and Sargent Coppens unlawfully restrained Plaintiff.  The MSP Defendants, however, also argue that they are entitled to summary judgment with respect to Plaintiffs' intentional tort claims, including her claim of false imprisonment, based on governmental immunity.

Under Michigan law, to be entitled to governmental immunity for an intentional tort, a defendant must establish: "that he was acting in the course of his employment [or] at least reasonably believed that he was acting within the scope of his authority, that his actions were discretionary in nature, and that he acted in good faith."  *Miller*, 606 F.3d at 254 (citing *Odom v. Wayne County*, 482 Mich. 459, 480, 760 N.W.2d 217, 228 (2008)). This Court finds the only fact at issue in this case with respect to governmental immunity to be whether Detective Grandison and Sargent Coppens acted in "good faith" or "without malice."  *Id*.  As the Michigan Supreme Court explained in *Odom*, "[t]he good-faith element . . . protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent."  482 Mich. at 481-82, 760 N.W.2d at 229.  A state defendant-employee does not act with good faith when he "does not act honestly," but acts with "a wanton or reckless disregard for the rights of another." *Id*. at 473-74, 760 N.W.2d at 225.

Detective Grandison contends that he moved Plaintiff into the holding cell because she was being belligerent and that he searched her belongings because he was afraid that she may have had a weapon.  The videotape of the incident creates a genuine issue of material fact with respect to the honesty of his claims.  The Court already has addressed

27

Detective Grandison's claim that he searched Plaintiff's bags for fear that she was armed.
As to Plaintiff's alleged belligerence, the Court believes that it is for the jury to evaluate
Plaintiff's conduct and decide whether a reasonable officer would have found it necessary
to move her into the holding cell.  In light of the information known to Detective
Grandison and Sargent Coppens before Plaintiff was handcuffed and transported to the
MSP office, the Court also finds a question of fact as to whether these officers acted with
reckless disregard of Plaintiff's rights when they thereafter continued to detain her and
charge her with check fraud. The Court therefore finds a genuine issue of material fact
with respect to whether Detective Grandison and Sargent Coppens are entitled to
governmental immunity with respect to Plaintiff's false arrest claims.

### E.      Assault and Battery against the MSP Defendants

Under Michigan law, an assault is defined as "an attempt to commit a battery or an
unlawful act which places another in reasonable apprehension of receiving an immediate
battery." *People v. Nickens*, 470 Mich. 622, 627, 685 N.W.2d 657, 661 (2004)).  A
battery is defined as "an intentional, unconsented and harmful or offensive touching of
the person of another, or of something closely connected with the person." *Id*. at 628, 685
N.W.2d at 661.  "[A] police officer may use reasonable force when making an arrest. . . .
the measure of necessary force is that which an ordinarily prudent and intelligent person,
with the knowledge and in the situation of the arresting officer, would have deemed
necessary." *Marvin v. City of Taylor*, 509 F.3d 234, 252 (6th Cir. 2007) (quotation marks
and citation omitted).

28

For the reasons discussed earlier, the Court finds a genuine issue of material fact with respect to whether Detective Grandison and Sargent Coppens, but not Detective Vincent, are liable for assault and battery against Plaintiff and whether they acted in good faith so as to be entitled to governmental immunity.

### F.     Intentional/Negligent Infliction of Emotional Distress against the MSP Defendants and MGM

The facts of this case do not support a negligent infliction of emotional distress claim.  Such a claim requires proof of the following elements:

> (1) serious injury threatened or inflicted on a person, not the plaintiff, of a nature to cause severe mental disturbance to the plaintiff, (2) shock by the plaintiff from witnessing the event that results in the plaintiff's actual physical harm, (3) close relationship between the plaintiff and the injured person (parent, child, husband, or wife), and (4) presence of the plaintiff at the location of the accident at the time the accident occurred or, if not presence, at least shock "fairly contemporaneous" with the accident.

*Hesse v. Ashland Oil, Inc.*, 466 Mich. 21, 34, 642 N.W.2d 330, 337 (2002).

In contrast, to establish a claim of intentional infliction of emotional distress, a plaintiff must show: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Graham v. Ford*, 237 Mich. App. 670, 674, 604 N.W.2d 713, 716 (1999); *see also Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985). In *Graham*, the Michigan Court of Appeals provided the following description of the conduct required to support an intentional infliction of emotional distress claim:

> Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character,

29

and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Doe v. Mills*, 212 Mich. App. 73, 91, 536 N.W.2d 824 (1995). Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Id*. It is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602-603, 374 N.W.2d 905 (1985), quoting Restatement Torts, 2d, § 46, comment d, pp. 72-73. . . . The test has been described as whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts*, 422 Mich. at 603, 374 N.W.2d 905.

237 Mich. App. at 674, 604 N.W.2d at 716.

The only behavior in the present matter that the Court believes could possibly satisfy this test is Detective Grandison's treatment of Plaintiff, particularly his grabbing of her chair and dragging it, along with Plaintiff, into the holding cell. The Court believes that it is a jury question whether this conduct constitutes intentional infliction of emotional distress and therefore denies summary judgment to Detective Grandison on these claims. The Court concludes, however, that MGM and the remaining MSP Defendants are entitled to summary judgment with respect to these claims.

## IV.    Conclusion

For the reasons discussed, this Court concludes that MGM, MSP, and Detective Vincent are entitled to summary judgment with respect to all of Plaintiff's claims against them. Detective Grandison and Sargent Coppens are entitled to summary judgment to the extent they are sued in their official capacities and with respect to Plaintiffs' claims

30

alleging conspiracy and a failure to supervise or train under § 1983, defamation, and violations of the ELCRA. Sargent Coppens additionally is entitled to summary judgment with respect to Plaintiff's claims alleging an unlawful search pursuant to § 1983 and intentional/negligent infliction of emotional distress; although the Court finds a genuine issue of material fact with respect to Detective Grandison's liability on these claims. There also is a genuine issue of material fact precluding summary judgment in favor of Detective Grandison and Sargent Coppens with respect to Plaintiff's claims alleging an unlawful arrest or detention under § 1983 and her state-law claims alleging false imprisonment and assault and battery.

Accordingly,

**IT IS ORDERED**, that Defendant MGM's motion for summary judgment is **GRANTED** and Counts 1, 2, 3, and 9 of Civil Case No. 09-14101 are **DISMISSED WITH PREJUDICE** and MGM is **DISMISSED** from this lawsuit;

**IT IS FURTHER ORDERED**, that the MSP Defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. The following claims against the MSP Defendants are **DISMISSED WITH PREJUDICE**: (1) Plaintiff's claims alleging conspiracy and "refusing or neglecting to prevent" under 42 U.S.C. § 1983 (Counts 4 and 5 of Civil Case No. 09-12083 and Count 4 of Civil Case No. 09-14101); defamation/slander (Count 8 of Civil Case No. 09-12083 and Count 7 of Civil Case No. 09-14101); and violations of the ELCRA (Count 9 of Civil Case No. 09-12083 and Count 8 of Civil Case No. 09-14101). The Michigan Department of State Police and

31

Michigan State Police Trooper Clarence Vincent are **DISMISSED** from this lawsuit.


DATE: February 11, 2011                    s/PATRICK J. DUGGAN
                                           UNITED STATES DISTRICT JUDGE
Copies to:
Gabriel B. Locher, Esq.
Michael D. Socha, Esq.
Steven M. Cabadas, Esq.